**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**August 19, 2010**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

PAULINO SANCHEZ-CHAPARRO,

Defendant-Appellant.

No. 09-8012
(D.C. No. 2:08-CR-00019-ABJ-2)
(D. Wyo.)

**ORDER AND JUDGMENT**[*]

Before **HOLMES**, Circuit Judge, **BRORBY**, Senior Circuit Judge, and **EBEL**, Circuit Judge.

Paulino Sanchez-Chaparro appeals his drug-trafficking conviction and sentence. We have jurisdiction under 28 U.S.C. § 1291. Because the district court did not err in refusing to suppress evidence seized from a vehicle defendant was driving, in refusing to suppress his incriminating statements, in concluding

---

[*]      After examining the briefs and appellate record, this panel has determined unanimously to grant the parties' request for a decision on the briefs without oral argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

that there was sufficient evidence to convict him of conspiracy to distribute cocaine and methamphetamine, or in sentencing him, we AFFIRM.

## I.  BACKGROUND

Defendant lived near his brother, Leonardo Sanchez, in Cheyenne, Wyoming.  Leonardo's girlfriend was Rocio Orozco.  On November 20, 2007, Orozco complained to police that Leonardo had assaulted her.  She also informed them that Leonardo and defendant were involved in selling cocaine and methamphetamine.  That evening, officers conducted surveillance on Leonardo's apartment and attempted to corroborate the drug-trafficking information.  Among other information, Orozco had told them that defendant drove Leonardo to conduct drug business in various vehicles, including a gold Impala.  While the officers were watching the apartment, a Hispanic male arrived in a gold Impala. The unidentified man (who turned out to be defendant) and Leonardo visited a Wal-Mart.  After returning Leonardo to his apartment, the gold Impala drove to the area of a trailer park where defendant lived.  Checking the records on the Impala, officers found it was registered to defendant's wife.

Ultimately, officers obtained a search warrant for the apartment.  When they executed the warrant early in the morning on November 21, they seized 226.3 grams of cocaine, scales, ledgers, packaging material, and other drug paraphernalia, as well as two pistols and an assault rifle.

After the search of Leonardo's apartment, Lieutenant Robert Korber of the Cheyenne Police Department went to defendant's home to set up surveillance. The gold Impala was there, with some snow covering it. There also was a Ford Ranger pick-up truck, which Korber had seen parked there when he drove past the trailer the previous night, and an Escalade. Because the vehicles were there, Korber believed defendant was in the trailer. He began surveillance, though it was complicated by the distance he had to maintain to remain undetected. After he erroneously stopped a vehicle whose occupants turned out to be defendant's neighbors, he requested assistance. Detectives Thomas Garrison and Thomas Hood responded.

Garrison and Hood were able to position themselves in two locations with direct lines of sight to the trailer's door. People came and went from the trailer; the detectives' instructions were to stop vehicles containing persons who left the trailer but who had not been observed entering it. After about 60 to 90 minutes of surveillance, both Garrison and Hood saw two previously unseen Hispanic males leave the trailer. Hood advised Korber that he saw the men drive away in the Ranger. Garrison followed the Ranger, and Korber directed Garrison to stop it and identify the occupants. Garrison complied, determining that defendant was the driver, and a man identified as Pelón was the passenger. The conversation

was in English.[1]  Korber directed Garrison to transport defendant and Pelón to the police station for questioning.  Defendant consented to being taken to the station.  Police later searched the Ranger, seizing cell phones containing incriminating evidence.

At the station, reading from a waiver form written in English, Korber informed defendant of his *Miranda* rights.  *See Miranda v. Arizona*, 384 U.S. 436 (1966).  Korber believed that defendant understood his rights, as defendant responded to him in English.  When Korber felt that there might be some confusion, Michael Nallin of the Bureau of Alcohol, Tobacco, and Firearms, who speaks rudimentary Spanish, asked defendant in Spanish if he understood.  Defendant said he understood and signed the waiver form.  Initially the interview was in English, but at some point, Korber and Nallin requested translation by a Spanish-speaking officer.  That officer translated the latter part of the interview.  Defendant made incriminating admissions during the interview.

Defendant moved to suppress his statements, contending that his waiver of his *Miranda* rights was not knowing and voluntary because he did not understand enough English to comprehend the warnings.  Defendant also moved to suppress the cell phones seized from the Ranger on the ground that the stop violated *Terry v. Ohio*, 392 U.S. 1 (1968).  The district court denied both motions.

---

[1]      A recording of part of the traffic stop is in the record on appeal.

Ultimately, defendant pleaded guilty to illegally entering the United States (count 8). The jury found him guilty of conspiracy to possess with intent to distribute, and to distribute cocaine and methamphetamine (count 1), possession with intent to distribute cocaine and aiding and abetting (count 2), and being an illegal alien in possession of a firearm (count 4). The jury also found that counts 1 and 2 involved 226.3 grams of cocaine and 680.4 grams of methamphetamine. At sentencing, the district court increased defendant's base offense level by four levels under Sentencing Guideline § 3B1.1(a) (leader/organizer enhancement) and by two levels under Sentencing Guideline § 3C1.1 (obstruction-of-justice enhancement), resulting in an advisory Guidelines range of 324 to 405 months. The district court then reviewed other recent Wyoming drug-distribution cases and concluded that 240 months was the most appropriate sentence. Accordingly, it varied downward by three levels so that the advisory Guidelines range would encompass 240 months. It then sentenced defendant to two concurrent terms of 240 months' imprisonment on counts 1 and 2, with lesser concurrent sentences for counts 4 and 8. Defendant appeals.

## II. ANALYSIS

Defendant raises five arguments. The first two concern the district court's denial of his motions to suppress evidence, the third concerns the sufficiency of evidence of conspiracy to distribute methamphetamine, and the fourth and fifth arise from the calculation of his sentence.

### A. Suppression of Evidence

#### 1. Evidence from the Ranger

The district court refused to suppress the evidence recovered from the Ford Ranger, holding that the officers had reasonable suspicion that defendant was one of the occupants of the truck and probable cause to arrest him. Defendant contends that the district court erred because the officer stopped the truck "not on a particularized and objective basis," but instead on a "mere hunch." Aplt. Br. at 10 (quotation omitted).[2]

"In assessing a denial of a motion to suppress, this court accepts the factual findings of the district court, and its determination of witness credibility, unless they are clearly erroneous." *United States v. Chavez*, 534 F.3d 1338, 1343 (10th Cir. 2008) (alteration and quotation omitted). "Ultimately, however, this court must review de novo the reasonableness of the government's action under the Fourth Amendment." *Id.* It is the government's burden to prove reasonableness, but we view the evidence in the light most favorable to the government. *See id.*

"[T]he principles set forth in *Terry v. Ohio* . . . guide this court's analysis of the reasonableness of the traffic stop. Thus, we examine whether the traffic stop was (1) justified at its inception and (2) reasonably related in scope to the

---

[2] In his reply brief, defendant clarifies that he challenges only the traffic stop, not his arrest.

circumstances which justified the interference in the first place." *Id.* (citation omitted). Defendant challenges only the first of these factors. To justify "the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21. But a police officer may not rely on "his inchoate and unparticularized suspicion or hunch." *Id.* at 27. "The conduct of the officers is judged by an objective standard taking the totality of the circumstances and information available to the officers into account." *United States v. Lang*, 81 F.3d 955, 965 (10th Cir. 1996).

The stop of the Ranger was justified at its inception because the police had probable cause to arrest defendant and a reasonable suspicion that he was an occupant of the truck. Orozco had reported that defendant and Leonardo were involved with drug-trafficking, and officers had corroborated much of Orozco's information (including the seizure of more than 200 grams of cocaine from Leonardo's apartment). They knew defendant's gender, ethnicity, and address. Orozco had stated that defendant drove Leonardo in a gold Impala, and the night of November 20, they had followed a Hispanic male driving a gold Impala (which was registered to defendant's wife) from Leonardo's apartment to the Wal-Mart and back, and then to the area of the trailer park where defendant lived.

The next morning, the Impala and two other vehicles (including the Ford Ranger that Korber had seen there the previous night) were at the trailer. This

information allowed the officers to form a reasonable belief that defendant was in the trailer. Further, in contrast to the several persons who visited for short periods of time (and who were not stopped), defendant and Pelón had not been seen entering the trailer during the surveillance. Defendant's reliance on the stop of his neighbors to show that the officers' surveillance was unfocused and inexact is unpersuasive. Korber testified at the suppression hearing that he could not get too close to the trailer, and he only saw the vehicle that he initially stopped as it left the trailer park. But after the erroneous stop, he asked for additional officers to assist. Both Hood and Garrison actually saw defendant and Pelón leave the trailer, and Hood saw them drive away in the Ranger.

Under the totality of the circumstances, there was sufficient justification for Garrison, acting under Korber's instructions, to stop the Ranger. *See id. at* 965-66 (upholding stop of vehicle where officers reasonably suspected person of criminal activity and believed he was in the vehicle); *see also Chavez*, 534 F.3d at 1344-48 (holding that officer was objectively justified in making traffic stop where he acted on the strength of other officers' information of drug-trafficking by passenger). In short, the district court did not err in denying the motion to suppress the evidence from the Ranger.

### 2. Incriminating Admissions

The district court concluded that defendant understood enough English to make a knowing and voluntary waiver of his *Miranda* rights. Defendant contends

that the court erred in evaluating his ability to understand English and, therefore, that the waiver was not knowing and intelligent. "The validity of a defendant's waiver of his or her Fifth Amendment rights is reviewed de novo with the underlying facts reviewed under the clearly erroneous standard." *United States v. Morris*, 287 F.3d 985, 988 (10th Cir. 2002).

A waiver of *Miranda* rights must be made "voluntarily, knowingly, and intelligently." *Miranda*, 384 U.S. at 444. "'[T]he relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). And "the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* Defendant does not challenge voluntariness, instead focusing on the court's finding regarding his English proficiency and the conclusion that the waiver was knowing and intelligent. "Whether [defendant] understood his *Miranda* rights is a question of fact, which underlies the legal question of whether his waiver was knowing and intelligent." *Valdez v. Ward*, 219 F.3d 1222, 1231 (10th Cir. 2000) (citations omitted).

Having independently reviewed the record, including the recording of the traffic stop, we cannot conclude that the district court clearly erred in finding that defendant understood sufficient English to understand the *Miranda* warnings. Defendant generally responded appropriately to Garrison's questioning during the

traffic stop. He asked Garrison if there would be a Spanish-speaker at the station, and was told that there would, but he never asked for a translator when he was at the station. When it appeared that defendant might be having some difficulty understanding the warnings given at the station, Nallin asked him in Spanish if he understood, and he responded that he did. Further, defendant conversed with officers in English during a search of his trailer. These facts support the district court's finding. *See id.* (defendant appropriately responded to questioning); *United States v. Lugo*, 170 F.3d 996, 1004 (10th Cir. 1999) ("Although it would have been preferable to give [defendant] a *Miranda* warning in Spanish, the record indicates that [defendant] indicated to [the officer] that he understood those rights as they were being read to him in English, and responded to all questions in English."); *United States v. Toro-Pelaez*, 107 F.3d 819, 826 (10th Cir. 1997) (defendant spoke to troopers in English). Accordingly, the district court did not err in concluding that defendant's waiver of his *Miranda* rights was knowing and intelligent.

## B. Sufficiency of the Evidence

Count 1 of the indictment charged defendant with conspiracy to possess with intent to distribute, and to distribute, methamphetamine and cocaine. In finding defendant guilty on this count, the jury also found that the offense involved 680.4 grams of methamphetamine. The court calculated defendant's sentence based on that finding. Defendant concedes that there was sufficient

evidence of his involvement in a conspiracy to distribute cocaine. He argues, however, that (1) there was insufficient evidence to conclude that he conspired to distribute methamphetamine, and (2) there was insufficient evidence to support the jury's precise finding of 680.4 grams of methamphetamine. The standard of review is de novo, with the evidence viewed in the light most favorable to the government. *United States v. Curtis*, 344 F.3d 1057, 1069-70 (10th Cir. 2003). "Furthermore, our review is deferential to the jury's fact-finding, and we must sustain [defendant's] conviction if any rational juror could have found him guilty." *United States v. Cardinas Garcia*, 596 F.3d 788, 794 (10th Cir.), *cert. denied*, 130 S. Ct. 3299 (2010).

"In order to obtain a conspiracy conviction the government must show [1] that two or more persons agreed to violate the law, [2] that the Defendant knew at least the essential objectives of the conspiracy, [3] that the Defendant knowingly and voluntarily became a part of it, and [4] that the alleged coconspirators were interdependent." *United States v. Flores*, 149 F.3d 1272, 1277 (10th Cir. 1998) (alteration and quotation omitted). The record contains evidence of defendant's involvement in a conspiracy involving methamphetamine as well as cocaine.

An officer testified that defendant told police that he knew Leonardo was involved with drugs. Defendant admitted at trial that he helped Leonardo get certain cell phones, which the evidence showed were used in connection with

-11-

selling methamphetamine and cocaine. Defendant, Leonardo, and Pelón together rented Leonardo's apartment, from which Leonardo sold both cocaine and methamphetamine. Leonardo and defendant did all the talking with the landlord, but put the rental under Pelón's name. Defendant paid the deposit on the apartment—$800 in cash out of the $1,200 he had in his pocket.

Orozco testified that the methamphetamine business was Leonardo's, while the cocaine business was defendant's, but she also testified that defendant visited the apartment almost every day and that he would drive Leonardo around town. She stated that Leonardo acknowledged owing defendant money, even though Leonardo never handled any money for the cocaine transactions. She never saw Leonardo give defendant money—but Leonardo would have a large amount of cash from methamphetamine sales, then defendant would visit the apartment, and after the visit, Leonardo would have no cash. Another conspirator, Jordan Ivey, testified that she was giving Leonardo $1,000 a day for methamphetamine, but Leonardo never had any large amounts of money.

Finally, on November 20, 2007, the police trailed defendant's gold Impala from Leonardo's apartment to a Wal-Mart store. Another witness (the sister of a conspirator) described how her sister asked her to meet the Sanchez brothers that night at the Wal-Mart. The sister and an ex-boyfriend asked the witness to sign for a $1,100 money order at the Wal-Mart and give the brothers the money. Ivey confirmed that the money order represented proceeds from methamphetamine

sales. Viewing all of this evidence in the light most favorable to the government, as we must, we conclude that the evidence was sufficient to support the conviction on Count 1.

We also conclude that there was sufficient evidence for the jury to assess the amount of methamphetamine at 680.4 grams. Contrary to defendant's argument, the number was not simply "made up," Aplt. Br. at 26. At 16 ounces per pound, and 28.35 grams to the ounce (rounded up slightly from the most precise figure, which stretches several places to the right of the decimal), 680.4 grams is one and one-half pounds of methamphetamine. Orozco testified that she accompanied Leonardo to purchase methamphetamine on two occasions. She estimated the amount of methamphetamine she transported for him on the first occasion to be about a half-pound, and she estimated that he had twice that amount on the second occasion. Although defendant argues that her estimates were vague, it was the jury's job to weigh her credibility and determine whether they believed her. *See Cardinas Garcia*, 596 F.3d at 794 ("We accept at face value the jury's credibility determinations and its balancing of conflicting evidence.").

## C. Sentencing Issues

### 1. Leader/Organizer Enhancement

Defendant opposes the court's addition of four levels under Sentencing Guideline § 3B1.1(a), the enhancement for being a "leader or organizer of a

-13-

criminal activity that involved five or more participants or was otherwise extensive." He contends that the district court did not identify five persons who could properly be counted as "participants." He concedes that he failed to present this argument to the district court, instead opposing the § 3B1.1(a) enhancement on a different ground. Thus, our review is only for plain error. *See United States v. Simpson*, 152 F.3d 1241, 1250 (10th Cir. 1998) (stating that an objection on different grounds in the district court results in plain-error review). "Plain error occurs when there is (1) error, (2) that is plain, which (3) affects substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Hinson*, 585 F.3d 1328, 1333 (10th Cir. 2009), *cert. denied*, 130 S. Ct. 1910 (2010) (quotation omitted).

The Sentencing Commission has defined "participant" as "a person who is criminally responsible for the commission of the offense, but need not have been convicted." USSG § 3B1.1, comment. (n.1). As defendant concedes, he counts as a participant. *See United States v. Reid*, 911 F.2d 1456, 1464 (10th Cir. 1990), *abrogation on other grounds recognized by United States v. Cruz Camacho*, 137 F.3d 1220, 1224 n.3 (10th Cir. 1998). The district court identified five persons besides defendant as potential "participants." Defendant does not object to counting three of them (Leonardo, Ivey, and Miston Compton). Including defendant, then, there are four undisputed "participants." But he complains that

-14-

the remaining two persons (Andy Speck and Howard Knauer) were, at most, customers of the drug ring and thus not properly counted.

In light of the testimony that Speck distributed cocaine to others, it is not clear that Speck was a mere buyer, as defendant suggests. But even if counting Speck could be considered an error, defendant has not shown that his substantial rights were affected or that any error seriously affects the fairness of the proceeding. The evidence at trial implicated others in the drug-distribution scheme, including Pelón and Orozco. Thus, even not counting Speck, there were sufficient "participants" to allow the § 3B1.1(a) enhancement, and no plain error. *See United States v. Uscanga-Mora*, 562 F.3d 1289, 1295 (10th Cir.) (holding that where "the district court's sentencing decision was amply supported by [the] evidence" and "[t]he defendant thus received a sentence merited by the evidence," the defendant could not show the error affected his substantial rights), *cert. denied*, 130 S. Ct. 289 (2009).

### 2.    Obstruction-of-Justice Enhancement

After finding that defendant perjured himself in testifying at trial, the district court added two levels for obstruction of justice under Guideline § 3C1.1. *See* USSG § 3C1.1, comment. (n.4(b)) (stating that committing perjury is within the conduct addressed by § 3C1.1). Defendant argues that the district court failed to make the findings required to support the perjury determination. This issue

also is reviewed for plain error, since he did not raise any objection at sentencing. *See Uscanga-Mora*, 562 F.3d at 1293.

A sentencing enhancement for perjury is appropriate only when a defendant "gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *United States v. Dunnigan*, 507 U.S. 87, 94 (1993). Accordingly, "if a defendant objects to a sentence enhancement resulting from her trial testimony, a district court must review the evidence and make independent findings necessary to establish a willful impediment to or obstruction of justice, or an attempt to do the same, under the perjury definition." *Id*. at 95. This court "require[s] that a district court be explicit about which representations by the defendant constitute perjury. . . . [I]t has long been a requirement in the Tenth Circuit that the perjurious statement be identified, at least in substance." *United States v. Hawthorne*, 316 F.3d 1140, 1146 (10th Cir. 2003) (quotation and citation omitted).

The district court's § 3C1.1 findings stated:

> Defendant denied any connection with this conspiracy; it was all an unfortunate mistake perpetrated upon a hardworking individual by his dissolute brother and a group of police officers who had decided to violate their oath and their careers in favor of bringing to this court a pack of lies. Frankly an incredible position for him to take . . . . Clearly, this defendant was an able, not drug addicted, not scattered, focused person engaged in the business of distribution of these substances.

-16-

Amended Record on Appeal, Vol. 3 (Sentencing Transcript) at 328-29.

This court has held that

> [t]he district court may generally identify the testimony at issue from his or her trial notes or memory and it is sufficient if such testimony is merely described in substance so that when we review the transcript we can evaluate the *Dunnigan* findings of the elements of perjury against an identified line of questions and answers without having simply to speculate on what the district court might have believed was the perjurious testimony.

*United States v. Massey*, 48 F.3d 1560, 1574 (10th Cir. 1995). The district court's finding on the point may not be ideal, but it satisfies this standard. The court's general descriptions correlate to particular parts of the transcript of defendant's testimony that are identifiable on review. There was no plain error in assessing the two-point enhancement for perjury.

## III. CONCLUSION

The judgment of the district court is AFFIRMED.

Entered for the Court

David M. Ebel
Circuit Judge