# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued April 24, 2012          Decided August 14, 2012

No. 08-3011

UNITED STATES OF AMERICA,
APPELLEE

v.

ALVIN GASKINS,
APPELLANT

---

Appeal from the United States District Court
for the District of Columbia
(No. 04cr00379-06)

---

*Julian S. Greenspun*, appointed by the court, argued the cause and filed the briefs for appellant.

*Suzanne Grealy Curt*, Assistant U.S. Attorney, argued the cause for appellee. With her on the brief were *Ronald C. Machen Jr.*, U.S. Attorney, and *Roy W. McLeese III*, *Elizabeth Trosman*, and *John K. Han*, Assistant U.S. Attorneys. *Mary B. McCord*, Assistant U.S. Attorney, entered an appearance.

Before: SENTELLE, *Chief Judge*, and HENDERSON and GARLAND, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* GARLAND.

GARLAND, *Circuit Judge*: Alvin Gaskins appeals his conviction for conspiracy to distribute narcotics. After hearing oral argument on Gaskins' appeal, we issued an order reversing his conviction and directing the entry of a judgment of acquittal. Our order stated that an opinion would follow in due course. This is that opinion.

A jury convicted Gaskins of being a member of a conspiracy that was alleged to have consisted of more than twenty individuals and to have taken place over a period of five years. To describe the events of those years, the government proffered eight cooperating witnesses, more than 14,000 intercepted telephone conversations, visual and video surveillance, and evidence seized during the execution of search warrants.

Not one piece of evidence put Gaskins together with drugs, or conversations about drugs, involved in the conspiracy. None of the cooperating witnesses, many of whom pled guilty to participating in the conspiracy, described Gaskins as having any knowledge of the conspirators' drug trafficking activities. None of the recorded telephone conversations in which Gaskins participated mentioned drugs or drug transactions, whether in clear or coded language. Nor did any of the conversations of any other conspirators mention drugs or drug transactions in connection with Gaskins. No surveillance detected Gaskins engaging in drug transactions, in the presence of drugs, or engaging in any conspiratorial meetings. And despite the execution of multiple search warrants, including one at the apartment in which Gaskins lived, the government found no guns, drugs, or drug paraphernalia associated with Gaskins. Moreover, although there was substantial evidence of the wealth amassed by other conspirators, there was no such evidence regarding Gaskins. To the contrary, the only evidence was that he lived in a modest apartment with his mother.

To convict a defendant of conspiracy to distribute a controlled substance, the government must prove, beyond a reasonable doubt, that the defendant knowingly entered into the conspiracy with the specific intent to further the unlawful objective of drug distribution. We have reversed Gaskins' conviction because no reasonable juror could have so found.

I

In 2004, a grand jury returned a 100-count indictment charging 21 defendants, including Gaskins, with being members of a conspiracy to distribute narcotics that operated between 1999 and September 2004, and that spanned Virginia, the District of Columbia, and Maryland. The alleged objects of the conspiracy were the distribution of heroin, cocaine, cocaine base, and phencyclidine (PCP). Many of the 21 defendants pled guilty, and the ones who did not went to trial in two groups in 2006.

Gaskins went to trial with the second group of four defendants, which also included Gerald Eiland, Frederick Miller, and Robert Bryant. The indictment, which contained dozens of counts relating to narcotics trafficking, conspiracy, racketeering, and continuing criminal enterprise, charged Eiland and Miller with being the leaders of the conspiracy. Bryant was charged with being the conspiracy's PCP supplier.

The government's theory was that Gaskins was a "business manager" of the conspiracy. The indictment charged him with: (1) conspiring to distribute and possess with intent to distribute[1] heroin, cocaine, cocaine base, and PCP, in violation of 21 U.S.C.

---

[1]For convenience, this opinion will omit the phrase "and possess with intent to distribute" from the description of the conspiracy charge.

§ 846 (the "narcotics conspiracy"); (2) conspiring to participate in a racketeer influenced corrupt organization, in violation of 18 U.S.C. § 1962(d) (the "RICO conspiracy"); and (3) four counts of using a communication facility to facilitate a drug trafficking offense, in violation of 21 U.S.C. § 843(b) (the "telephone counts").

## A

1. The government's case consisted of the testimony of cooperating conspirators, wiretaps and consensual recordings, visual and video surveillance, and seizures from the execution of search warrants.

Eight cooperating witnesses testified on behalf of the government. All were deeply involved in the drug trafficking conspiracy. All but one were facing life in prison if they did not obtain a downward sentencing departure in consideration for cooperating with the government. Nonetheless, none testified about any connection between Gaskins and a narcotics conspiracy.

Darius Ames testified that he was a close friend of Eiland's and began selling drugs with him in 1997. He said that during one period, he bagged heroin for Eiland in Eiland's apartment in Alexandria, Virginia. There, he processed and bagged the drugs six to eight hours a day, twice a week, and was paid $500 per week. He testified that only he, Eiland, and Miller had keys to the apartment, and that Eiland and Miller were the only people he ever saw there. Ames also said that he was the one who paid the utility bills. He testified that another conspirator, Ricky Gore, was given most of the heroin to distribute, and that only he, Gore, and an individual named Simon Craig collected the proceeds from street distribution. Ames also testified that he made plane trips with Eiland and others to Phoenix, Arizona to

obtain heroin, which they brought back to the apartment concealed in their clothes. Ames said nothing about Gaskins having any role in the conspiracy.

Ricky Gore testified that he was a "lieutenant" in Eiland's organization. During 2002-04, Gore said, Darius Ames gave him approximately 1,500 bags of heroin per week to distribute. Gore explained to the jury the coded language the conspirators used to discuss narcotics transactions. He also testified that he made between $8,000 and $10,000 a week, and that he used the money to buy luxury cars for himself, his wife, and his mistress, and to pay rent on an apartment for the mistress. Gore testified that, although he knew Gaskins socially, he did not know of anything that linked him to drugs.

The testimony of four other conspirators did not mention Gaskins. Huber Garcia testified that he supplied cocaine and heroin to Eiland and his associates, and that he made enough money from drug trafficking to spend $10,000 a month on clothes, cars, women, and jewelry. Tyrone Thomas testified that he transported drugs and money for the conspiracy, and that defendant Robert Bryant (whom the jury acquitted) was Miller's PCP supplier. Je Bradford testified that he was a distributor for Eiland. Brian Lipscombe, who sold heroin and cocaine for Eiland, testified to shooting someone on Eiland's behalf. Neither Garcia, nor Thomas, nor Bradford, nor Lipscombe said anything about Gaskins.

Another cooperating witness, Charles Brown, was Frederick Miller's cousin. Brown testified that he took plane trips to Kansas City and Los Angeles for the purpose of transporting money that Miller gave him to deliver to defendant Bryant. Brown said he did not know who made the plane reservations or who paid for them. The only person he spoke to about reservations or scheduling was Miller, who would instruct him

to pick up his tickets at the airport where they had been reserved in Brown's name. Brown's testimony did not mention Gaskins in connection with any of his trips except one. On February 19, 2004, when Brown could not get on a flight to Los Angeles because he did not have proper identification, Brown called Miller. Miller told him to call Gaskins, which he did. Brown testified that he did not know why Miller told him to call Gaskins, and that he did not discuss the purpose of his trips with Gaskins.[2] This was the only mention of Gaskins in Brown's testimony.

The eighth cooperating witness, Rayshawn Briggs, testified that he started selling drugs acquired from Eiland in February of 2002. In 2003, Briggs was in jail, facing charges carrying a mandatory life sentence. He began cooperating with the government and was interviewed six or seven times by the FBI and U.S. Attorney's Office. Briggs testified that during those interviews, the government expressed an interest in Gaskins. Briggs said that he knew Gaskins from the neighborhood and that he knew Gaskins was "close" to Miller. He told the FBI that in 2001, he had asked Gaskins if he could get a quarter ounce of crack cocaine for him. Gaskins got the crack for Briggs, who paid him $250 for it. Briggs said he did not know from whom Gaskins had obtained the crack. The government does not contend that this sale was part of the narcotics conspiracy charged in this case.

Briggs also testified that he was motivated to get his pending criminal cases resolved and to get out of jail. In January 2004, he entered into a plea agreement pursuant to

---

[2]All Brown said about the conversation was that Gaskins "was asking me what was wrong, what was the problem. I was letting him know that I don't have a government ID." 10/18/06 (am) Tr. 28 (S.A. 385).

which he was released to help the government obtain information regarding several suspects, including Gaskins. As a condition of release, he had to report to the FBI on a daily basis. Briggs testified that he had multiple contacts and conversations with Gaskins after he was released. Although he said that Gaskins helped him fill out job and housing applications, Briggs said that none of their interactions involved the subject of narcotics.

In addition to the cooperators, the government proffered the testimony of law enforcement officers regarding evidence obtained during the government's 18-month investigation.

Detective Steven Hall testified that law enforcement conducted surveillance of numerous locations -- including the Virginia apartment where the heroin was bagged and streets in the District of Columbia where heroin sales took place -- using stationary vans, moving cars, and a mounted pole camera. There was no evidence that Gaskins participated in any drug transactions or conspiratorial meetings, no evidence that he was seen in the presence of drugs or drug paraphernalia, and no evidence that he was ever present at or near the Virginia apartment. The government took fingerprint evidence in the Virginia apartment, but Gaskins' prints were not found.

The government also executed search warrants at multiple locations used by the conspirators, which turned up heroin, cocaine, cash, and drug packaging materials. *See* U.S. Br. 19-20 & n.21. None of this evidence connected Gaskins to the conspiracy. In addition, the government searched the apartment in southeast Washington where Gaskins lived with his mother. That search yielded neither drugs, nor records, nor any other evidence linking Gaskins to the conspiracy. Nor did it (or any other search) yield evidence that Gaskins had expensive jewelry, clothes, cars, or homes -- as searches did uncover with respect

to other conspirators. The government's only evidence was that Gaskins lived in his mother's modest apartment.

During the search of the Virginia apartment in which the conspirators bagged heroin, officers found the apartment's lease. Although Gaskins' name was on it, the government did not attempt to prove that the handwriting was Gaskins', and it offered no evidence that Gaskins paid the monthly rent. Investigators also found utility bills with Gaskins' name on them in the apartment. As noted above, however, Darius Ames testified that he was the one who paid the utility bills, and the government offered no evidence to the contrary.

FBI Special Agent John Bevington testified that the government conducted four months of wiretaps, from February 17 to June 26, 2004, during which it intercepted more than 14,000 calls. Recordings of many calls were played to the jury. Bevington and Detective Hall testified that two signature traits of a narcotics conspiracy are using coded language and asking conspirators to go to a land line, both of which could be discerned in several of the recorded calls. None of the calls by other alleged conspirators mentioned drugs or drug transactions in connection with Gaskins, whether in clear or in coded language. No call in which Gaskins participated mentioned drugs or drug transactions at all, in code or otherwise, and he was never asked to go to a land line. There was a conversation in which Miller told Gaskins to keep his credit card payments up to date, another in which the two discussed Gaskins signing a check "over to Dream Team Investigations" (discussed below) so that Gaskins could get money for Miller, and others about money Miller owed Gaskins.

Agent Bevington further testified that the telephone company advised that the subscriber of the cell phone that Miller used was listed as "Alvin Gasgen." Although Bevington

testified that the phone company later sent him information listing the name "Alvin Gaskins," the government did not obtain a copy of the subscriber application or any other records. The government did not introduce any evidence that Gaskins paid the telephone bills.

Finally, the government introduced airline records showing that Gaskins was listed as the purchaser of some of Charles Brown's plane tickets. (There was no such evidence regarding Darius Ames' flights to Phoenix.) It also introduced recorded telephone calls in which Miller asked Gaskins to book two flights for Brown; the calls did not mention either narcotics or the purpose of the trips. Those calls were the basis for the indictment's four telephone counts against Gaskins. As we note below, Gaskins was acquitted on all four counts. And co-defendant Robert Bryant, the person to whom Brown said he was delivering money on those trips, was acquitted on all counts.

2. The theory of Gaskins' defense was that he was not involved in a narcotics conspiracy, but rather was a "gofer" who ran Miller's personal errands and performed miscellaneous tasks for his private investigations company, Dream Team Investigations (DTI) -- including making occasional airplane reservations. Neither Gaskins nor the other defendants testified.

The defense called a police detective who testified that Miller was licensed as a private investigator from 2002 until October 2005, and that he had a business license for Dream Team Investigations (DTI). The defense introduced Miller's license, the business license, and a D.C. tax registration certificate for DTI. Other notes and records relating to DTI were also discovered at Miller's home. On cross examination, Detective Hall acknowledged that recordings of Miller's calls reflected various business dealings related to DTI. Hall also

testified that one of the documents seized at Miller's residence was "a legal notebook paper with [DTI] brainstorming ideas." 10/16/06 (am) Tr. 18 (S.A. 335).

In support of its defense that Gaskins' work for Miller involved DTI, the defense played recordings of calls in which the two discussed such matters as business cards, checks, loans, court records, and taxes. *See* U.S. Br. 52. It also played several conversations in which Miller asked Gaskins to run personal errands for him. In its rebuttal case, the government called witnesses from the local and federal public defenders' offices, who testified that their offices had never reimbursed DTI for investigative work.

### B

After a three-month trial and fourteen days of deliberations, the jury convicted Miller and Eiland of most of the counts on which they were charged. It did not convict them on any counts involving PCP, however, and it found that PCP distribution was "not proven" as an object of the conspiracy. The jury acquitted Bryant (the third co-defendant and alleged PCP supplier) on all counts on which he was charged.

With respect to Gaskins, the jury initially returned a verdict form that found him not guilty on all four telephone counts. It also found him not guilty on the RICO conspiracy count, and checked "not proven" for each of the racketeering acts listed on that form. One of those acts was the narcotics conspiracy that was charged against Gaskins in a separate count. With respect to that separate charge of narcotics conspiracy, although the jury checked "guilty" on the general verdict line, it checked "not proven" for each of the four objects of the conspiracy listed on the form (distribution of heroin, cocaine, cocaine base, and

PCP). The judge read the verdict aloud to the jury; each juror was polled; and all agreed that it was their verdict.

Gaskins' counsel asked the district court to enter a judgment of acquittal on the narcotics conspiracy count. (Judgments of acquittal were eventually entered on the telephone and RICO counts.) The court denied the request and sent the narcotics conspiracy count back to the jury with a new verdict sheet. That afternoon, the jury again returned with a general verdict of guilty. This time, however, it checked "proven" for the object of distributing heroin, and checked a quantity of more than 100 grams but less than one kilogram. The court accepted the verdict and ultimately sentenced Gaskins to prison for 262 months (22 years).

Gaskins filed a timely appeal. He had been in jail since the date of his arrest and, as of the date of oral argument, had been incarcerated for almost eight years. After the argument, we issued an order reversing the judgment of conviction and directing the entry of a judgment of acquittal, on the ground that a reasonable jury could not have found that Gaskins knowingly participated in the conspiracy with the intent to commit the offense of distributing narcotics.

Gaskins contends not only that the prosecution's evidence was insufficient to support a guilty verdict on the conspiracy charge, but also that the district court erred in declining to enter a judgment of acquittal when it received the jury's initial verdict form. Because we agree with Gaskins that the evidence was insufficient, we do not address his second contention.

## II

When reviewing a conviction for sufficiency of the evidence, "the relevant question is whether, after viewing the

evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). "In making that determination, 'the prosecution's evidence is to be viewed in the light most favorable to the government, drawing no distinction between direct and circumstantial evidence, and giving full play to the right of the jury to determine credibility, weigh the evidence and draw justifiable inferences of fact.'" *United States v. Branham*, 515 F.3d 1268, 1273 (D.C. Cir. 2008) (quoting *United States v. Dykes*, 406 F.3d 717, 721 (D.C. Cir. 2005)).

To prove that a defendant entered into a narcotics conspiracy under 21 U.S.C. § 846, the government must prove that he did so knowingly. *See, e.g.*, *United States v. Childress*, 58 F.3d 693, 708-09 (D.C. Cir. 1995). Knowledge alone, however, is not enough. *Id.* The government must also prove that the defendant had the "specific intent to further the conspiracy's objective." *Id.* at 708; *see United States v. Wilson*, 160 F.3d 732, 737 (D.C. Cir. 1998); *United States v. Tarantino*, 846 F.2d 1384, 1392 (D.C. Cir. 1988); *see also Ingram v. United States*, 360 U.S. 672, 678 (1959) (holding that "[c]onspiracy to commit a particular substantive offense cannot exist without at least the degree of criminal intent necessary for the substantive offense itself" (internal quotation marks omitted)). Accordingly, to sustain Gaskins' conviction, we must conclude that a reasonable jury could have found, beyond a reasonable doubt, that he knowingly entered into the Miller/Eiland conspiracy with the specific intent to further its objective of distributing narcotics.

A

As discussed above, the government had the cooperation of eight conspirators, intercepted thousands of telephone calls

between members of the conspiracy, conducted weeks of surveillance, and searched numerous apartments.  In all of this, there was no evidence that Gaskins ever discussed drugs, distributed drugs, or was in the presence of drugs connected to the conspiracy.  None of the cooperating witnesses testified that Gaskins was involved in their drug trafficking operation -- including one witness, Rayshawn Briggs, who was released from jail for the specific purpose of obtaining evidence about Gaskins (among others).  In none of the intercepted calls did the conspirators mention Gaskins in connection with their drug dealing, nor was Gaskins ever heard discussing narcotics or narcotics transactions, in coded language or otherwise.  In none of the surveillance was he seen taking part in a drug transaction or conspiratorial meeting.  And none of the searches yielded any evidence of Gaskins' involvement in the drug conspiracy.  Finally, unlike the other alleged conspirators, there was no evidence that Gaskins received any of the lavish proceeds that the conspiracy yielded.

In short, there was no affirmative evidence that Gaskins knowingly joined the narcotics conspiracy or had the specific intent to further its aims.  Moreover, given the scope of the government's investigation and the role its witnesses played in the conspiracy, any reasonable jury should have wondered why the government could not find such evidence.  *See Wilson*, 160 F.3d at 737 (noting that, when witnesses with inside knowledge of a conspiracy "[a]re in a position to offer testimony about the nature of [a defendant's] involvement . . . , the absence of such evidence is telling").

B

The government makes five principal arguments as to why, notwithstanding the above, the evidence was sufficient to sustain the jury's verdict.

1.  The government's brief begins with an argument based on Rayshawn Briggs' testimony.  Briggs testified that in 2001, Gaskins sold him a quarter ounce of crack cocaine.  But the government does not contend that this single sale was part of the conspiracy for which Gaskins was convicted.  *See* Oral Arg. Recording at 19:18-:32.  Indeed, the only substance the jury found "proven" with respect to Gaskins was heroin, not crack. Although Federal Rule of Evidence 404(b) may have permitted the government to argue (as it did) that the sale demonstrated Gaskins' *familiarity* with drug dealing, the sale does not show that he knowingly joined the Miller/Eiland conspiracy with the specific intent to achieve its unlawful objective.[3]

The government protests the references in Gaskins' brief to the fact "that Briggs was cooperating and facing a life sentence," arguing that this merely went to his credibility and that credibility is "a matter for the jury to decide."  U.S. Br. 39.  But this misunderstands the purpose of the defendant's references to Briggs.  Gaskins' (principal) argument is not that Briggs lacked credibility.  To the contrary, he stresses that Briggs honestly acknowledged that he was motivated to provide the government with whatever evidence he had on Gaskins.  Rather, given this motivation and Briggs' role in the conspiracy, Gaskins argues --

---

[3]In addition to demonstrating familiarity, the government argues that the jury could have concluded that Gaskins obtained the crack for the sale from Miller.  This claim is based on Briggs' testimony that, although he did not actually know where Gaskins got the drugs, he *thought* Gaskins would be able to get them from Miller.  Whether or not Briggs' thought was reasonable, asking the jury to make an inference based on that inference "crosses the line from permissible inference to improper speculation."  *United States v. Teffera*, 985 F.2d 1082, 1088 (D.C. Cir. 1993); *see id.* ("'A jury is entitled to draw a vast range of reasonable inferences from evidence, but may not base a verdict on mere speculation.'" (quoting *United States v. Long*, 905 F.2d 1572, 1576 (D.C. Cir. 1990))).

and reasonably so -- that the fact that Briggs was unable to point to anything other than a single crack transaction was reason to doubt Gaskins' involvement in the charged conspiracy.

2.  The government next argues that the fact that Gaskins' name was on the apartment lease and cell phone application is proof that he was a member of the conspiracy.  Gaskins notes that the government did not analyze the handwriting on the lease and did not even have the cell phone application, and argues that there was no evidence that he -- as opposed to Miller -- was the one who put his name on both forms.  Indeed, there is support for the possibility that Miller misused Gaskins' name:  In a recorded telephone conversation, Miller was heard identifying himself to an airline representative as Gaskins.

But even if the government had proven that the handwriting was Gaskins', that would still be insufficient to establish that he knowingly participated in the conspiracy with the specific intent to further its objective of distributing narcotics.  There was no evidence that Gaskins knew the apartment would be used as a stash house.  Indeed, there was no evidence that he had ever even been there.  There was no such evidence in all the hours of visual and video surveillance.  And when the apartment was dusted for fingerprints, Gaskins' prints were not found.  Not one of the eight cooperating witnesses testified that he ever saw Gaskins in the apartment.  To the contrary, Darius Ames testified that only he, Eiland, and Miller had keys to the apartment, and that Eiland and Miller were the only people he ever saw there.  And although Gaskins' name was on the utility bills, there was no evidence of how it got there and no evidence that he was the one who paid those bills or the rent; indeed, Ames testified that he was the one who paid the bills.  *Cf. United States v. Lucas*, 67 F.3d 956, 958 (D.C. Cir. 1995) (reversing a conviction for (constructive) possession of narcotics that rested on the defendant's name appearing on the lease of an

apartment used to store drugs where, as here, the defendant lived elsewhere and did not have a key).

Similarly, there was no evidence that Gaskins knew that Miller's cell phone (subscribed to in Gaskins' name) was to be used to conduct narcotics transactions. Nor, in all of the telephone calls intercepted on that phone (or any other telephone), was there any evidence to suggest that Gaskins knew it was being used for that purpose.

Needless to say, extra apartments and cell phones have lawful uses, including personal use and use by a private investigations agency. They also have uses that are unsavory, but nonetheless lawful -- including facilitating extramarital trysts. (One of the cooperating conspirators testified that he used his proceeds to pay the rent on an apartment for his mistress.) Moreover, apartments and cell phones have uses that *are* unlawful, but that have objects other than narcotics distribution -- ranging from illegal gambling to fencing stolen goods. Even if Gaskins did not think Miller's activities were on the up-and-up, there was no evidence that he thought they involved the object of the conspiracy for which he was convicted, let alone that he knowingly joined the conspiracy with the "specific intent to further the conspiracy's objective," *Childress*, 58 F.3d at 708. And without such evidence, a conviction cannot be sustained. *See, e.g.*, *United States v. Morrison*, 220 F. App'x 389, 395 (6th Cir. 2007) (reversing a conviction because, "[t]hough the totality of the evidence . . . admittedly shows that Morrison had knowledge of *some* illegal activity, what it fails to show is that Morrison knew the purpose of all this activity centered around drugs -- the essential object

of the conspiracy in which he was charged" (internal quotation marks omitted)).[4]

3.  The government also contends that the jury could have inferred Gaskins' participation in the conspiracy from the fact that he booked plane trips for conspirator and cooperating witness Charles Brown.  Although the airline supplied a list of information for several such trips with the purchaser identified as "Alvin Gaskins," the few recorded telephone conversations in which Miller asked Gaskins to book flights pertained to only two of those trips.  Brown testified that he did not know who made any of the reservations, and that he never spoke with Gaskins about them; it bears repeating, moreover, that another call showed Miller identifying himself as Gaskins when making a reservation on another flight.  The recorded conversations, which took place over only three days out of a conspiracy alleged to have lasted five years, are the only ones the government relies on for the proposition that Gaskins was a "facilitator" of the conspirators' travel.  Those conversations

---

[4]*See Ingram*, 360 U.S. at 677 (reversing a conviction where, "[w]hile the record clearly support[ed] a finding that [the defendants] were participants in a conspiracy to operate a lottery and to conceal that operation from local law enforcement agencies," there was "no warrant for a finding that they were . . . parties to a conspiracy with [the charged] purpose" of evading the payment of federal taxes on lottery operators); *Teffera*, 985 F.2d at 1087 (noting that courts have found that, although evidence "may be probative of [a] defendant's knowledge that he was 'caught up in a situation involving criminal activity,'" that is "not sufficient to show that [the] defendant knew of the specific conspiracy charged by the government" (quoting *United States v. Nusraty*, 867 F.2d 759, 765 (2d Cir. 1989))); *cf. United States v. Stanchich*, 550 F.2d 1294, 1300 (2d Cir. 1977) (Friendly, J.) (holding that "mere negative acquiescence . . . in the criminal conduct of others, even with guilty knowledge, is not sufficient to establish aiding and abetting").

were the basis for the four telephone counts with which Gaskins was separately charged.

We note first that, according to the government, the purpose of Brown's flights was to deliver payments to defendant Robert Bryant for supplying the conspiracy with PCP. But the jury found that none of the defendants were involved in a conspiracy to distribute PCP. Indeed, it found Bryant not guilty of any offense. Moreover, it found Gaskins not guilty on any of the four telephone counts.

More important, however, as with the apartment lease and cell phone application, there was *no* evidence that Gaskins knew anything at all about the purpose of the flights. Brown said he did not discuss their purpose with Gaskins, and there was no intercepted conversation in which anyone else did. As the Supreme Court has held, "'[w]ithout the knowledge, the intent cannot exist.'" *Ingram*, 360 U.S. at 678 (quoting *Direct Sales Co. v. United States*, 319 U.S. 703, 711 (1943)).

4. The government further suggests that the jury could have inferred that Gaskins was a member of the conspiracy from the fact that he had a close relationship with Miller. To establish that fact, the government cites Briggs' testimony that the two men were close, along with intercepted telephone calls in which: the two spoke of "signing over" a Dream Team Investigations check to get money for Miller; Miller told Gaskins it was important to keep his credit card payments current; Gaskins told Miller that he owed him money; and Miller used Gaskins' name and personal email address to make an airplane reservation.

The fact that Gaskins was close to Miller was plainly insufficient to support a conviction. *See, e.g.*, *United States v. Wardell*, 591 F.3d 1279, 1288 (10th Cir. 2009) ("[M]ere association, standing alone, is inadequate; an individual does not

19

become a member of a conspiracy merely by associating with conspirators known to be involved in crime." (internal quotation marks omitted)).[5] So were the conversations about checks, credit cards, payments, and email.[6] As we have said, there was no evidence that any of those conversations were related to drugs or drug transactions. And there was no evidence that Gaskins knew they were related.

By contrast, there was evidence to support Gaskins' defense that the conversations were related to his work as a "gofer" who ran Miller's personal errands and performed tasks for his Dream Team Investigations. Although the government is correct in suggesting that substantial evidence that DTI was not a real business could have permitted the jury to draw a negative inference, the government's evidence to that effect (that DTI had not been paid by the public defenders' offices) was hardly substantial. In any event, even proof that an exculpatory explanation was false would have been insufficient on its own to permit an inference that Gaskins knowingly joined a narcotics conspiracy with the required specific intent. That is particularly

---

[5]*See United States v. Dellosantos*, 649 F.3d 109, 115 (1st Cir. 2011) ("The agreement is the *sine qua non* of a conspiracy, and this element is not supplied by mere knowledge of an illegal activity . . . , let alone by mere association with other conspirators." (internal quotation marks omitted)); *United States v. Diaz*, 637 F.3d 592, 602 (5th Cir. 2011) ("If all that was shown was a defendant's . . . 'close association with conspirators,' jurors would not be entitled to infer participation in the conspiracy." (internal quotation marks omitted)); *Nusraty*, 867 F.2d at 764 ("[M]ere association with those implicated in an unlawful undertaking is not enough to prove knowing involvement.").

[6]Indeed, with respect to the latter, Detective Hall testified that nothing in any of the wiretaps suggested that Gaskins had ever used e-mail or the Internet.

so because Gaskins did not testify, and so did not make the exculpatory explanation himself. *See* Oral Arg. Recording at 23:12-:22 (acknowledgment by government counsel that, because he never testified, the jury could not infer that Gaskins lied about DTI).[7]

5. Finally, the government correctly notes that we must consider all of the evidence in its totality. We have done so, and nonetheless conclude that it is insufficient to sustain the verdict. The government maintains that such a conclusion is unwarranted because "[c]ourts have found the evidence of a defendant's participation in a conspiracy to be sufficient where, *inter alia*, the defendant rented an apartment or other facility that was used to conduct conspiratorial activity, such as the storage of drugs." U.S. Br. 33 (citing cases). The government makes the same point about procuring cell phones, scheduling plane flights, and several of the other facts discussed above. *Id.* at 35-36.

The government's descriptions of the cases it cites are not inaccurate, but the key is what the "*alia*" in those cases were. In none of those cases was the evidence of knowing and intentional participation in a conspiracy anywhere near as weak as it is here. In *United States v. Brown*, for example, the defendant not only

---

[7]In her closing argument, the prosecutor contended that Gaskins could not have been working for DTI because there were no telephone calls in which Gaskins asked Miller which client was to be billed for which expense, or told Miller whom he had appointments with on a specific day or that they were running out of office supplies. In his opening brief, Gaskins argues that those arguments constituted reversible error because Gaskins' counsel had never claimed that such duties fell within the scope of Gaskins' responsibilities. Counsel's claim was that Gaskins was an errand boy, not a bookkeeper or office manager. On appeal, the government does not make those arguments in support of the sufficiency of the evidence; it merely argues that they did not constitute reversible error. U.S. Br. 39-40, 50-56.

leased a storage unit where drugs and a bullet-proof vest were found; her own apartment also contained drugs and a bullet-proof vest, as well as a videotape of her co-conspirators counting large amounts of cash in front of a pound of drugs. 560 F.3d 754, 761, 770 (8th Cir. 2009). In addition, one of the co-conspirators was recorded calling the defendant from jail to ask that she collect drug payments, conceal assets, and contact prospective witnesses. *Id.* at 770. In *United States v. Rodriguez-Ortiz*, the defendant not only procured cell phones, he expressly told an undercover DEA agent that he could help him find a place to store drugs. 455 F.3d 18, 21 (1st Cir. 2006). And in *United States v. Sanchez-Chaparro*, the defendant not only procured cell phones and leased an apartment from which drugs were sold, he also "visited the apartment almost every day," drove his co-defendant "to conduct drug business in various vehicles," and told a police officer that he "knew" a principal co-conspirator was involved with drugs. 392 F. App'x 639, 645 (10th Cir. 2010).[8]

The case that appears to be most directly on point is the Second Circuit's decision in *United States v. Viola*, which reversed a RICO conspiracy conviction for insufficient evidence. 35 F.3d 37 (1994). There, the defendant, Michael Formisano, "performed odd jobs" for Anthony Viola, the

---

[8]Similarly, in *United States v. Lopez*, the defendant was not simply the lessee of an apartment in which drugs and packaging paraphernalia were found. 944 F.2d 33, 39 (1st Cir. 1991). Rather, she lived in the apartment, admitted that she shared the bedroom in which drugs were found under a mattress, and attempted to flee down the back stairway as the police were breaking down the front door. *Id.* at 39-40. And in *United States v. Ramirez*, the defendant, who had rented a storage unit that contained drug residue and paraphernalia, was also recorded in multiple telephone conversations "discussing the transfer of money and drugs." 479 F.3d 1229, 1252 (10th Cir. 2007); *see id.* at 1252-53 & n.16.

conspiracy's ringleader. *Id.* at 39. Despite the government's proof that Formisano agreed to sell stolen goods in isolated incidents, the court found the record "devoid of evidence that . . . Formisano knew what Viola and the other members of the conspiracy were up to." *Id.* at 44. Like Gaskins, Formisano had been tried as part of a group consisting of the conspiracy's ringleader and other principal operators. Also like Gaskins, Formisano was in large part an afterthought to the government's case.

In words that are particularly relevant here, Judge Walker noted:

> In the wealth of evidence presented at trial to show the existence and scope of the Viola enterprise, Formisano is hardly even mentioned. This absence is telling because the evidence included accomplice testimony from participants in the conspiracy who never mentioned Formisano, much less indicated their familiarity with him. Further, in the numerous surveillance tapes canvassed at length at trial, only a few scant references were made to Formisano, and then . . . not in relation to the broader enterprise.

*Id.* For much the same reasons, Gaskins' conviction, like Formisano's, must be reversed.

### III

Because no reasonable jury could have found, beyond a reasonable doubt, that Gaskins knowingly entered into a conspiracy with the specific intent to further the objective of distributing narcotics, the judgment of conviction is

*Reversed.*